UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **2:24-CR-20495-TGB-APP** |
| Plaintiff, | HON. TERRENCE G. BERG |
| vs. | **ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS PHYSICAL AND ELECTRONIC EVIDENCE (ECF NO. 29)** |
| **SHAHEEM HUNT,** | |
| Defendant. | |

On August 24, 2024, Detroit police officers responded to a 911 call of shots fired at an address on Appleton Street in the city of Detroit and two separate reports by officers in the area of hearing gunshots. Responding officers observed bullet holes in the front window of the home at 19179 Appleton Street and spent casings on the front porch and sidewalk, and a person fleeing the scene stated that three people had been shot. After knocking on the front door several times and receiving no response, police officers entered the home and found almost 30 people hiding in the basement. Then, while waiting for a search warrant, the officers state they heard a noise at the back door. Officers found the back door ajar and entered the home a second time, this time finding Defendant Shaheem Hunt hiding in one bedroom and a white spray-painted AR-style pistol in the closet of an adjoining room. A search warrant was issued almost contemporaneously with this second entry

into the house, resulting in the recovery of spent casings, boxes of ammunition, and seven firearms, including the spray-painted AR pistol. Hunt was arrested and charged being a felon in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1), for the ammunition housed inside the AR pistol.

Hunt has now filed a motion to suppress evidence from the Appleton Street house, asserting the two warrantless entries into the house were unlawful under the Fourth Amendment to the United States Constitution. ECF No. 29. Hunt seeks suppression of (1) an AR pistol containing 5.56 caliber ammunition, (2) his black iPhone, and (3) all derivative evidence from a forensic search of his cell phone. The government filed a response in opposition to Hunt's motion to suppress, ECF No. 34, and Hunt filed a reply in support of his motion, ECF No. 41. The Court held a hearing on the motion on June 26, 2025, at which counsel for Hunt and the government appeared and presented argument.

For the reasons set forth below, the Court will **DENY** Defendant's Motion to Suppress Physical and Electronic Evidence.

## I.    BACKGROUND

On March 6, 2024, Defendant Shaheem Hunt pleaded guilty in the Wayne County Third Circuit Court to one count of carrying a concealed weapon and one count of assaulting/resisting/obstructing police. Register of Actions, ECF No. 34-2, PageID.305. On April 16, 2024, Hunt was sentenced to 24-months' probation. *Id.* PageID.306; Complaint, ECF No.

1, PageID.3–4. He violated that probation less than two months later, and the state court added a condition of a GPS tether to Hunt's probation, restricting him to a home on Iris Street between the hours of 8 p.m. and 7 a.m. ECF No. 1, PageID.3–4.

On August 24, 2024, at approximately 9:20 p.m., Detroit Police officers Johnson and Patras were in the area of West 7 Mile and Berg Street and heard "multiple caliber gunshots with at least one appearing to be automatic approximately 2–3 blocks [away]." DPD Reports, ECF No. 34-3, PageID.317, 325. In addition, Officers Spencer and Epperson were on routine patrol near West 7 Mile and Appleton and also heard "multiple shots fired in the area." *Id.* PageID.311, 321. And, at that same time, the Detroit Police Department ("DPD") received a 911 call from an unknown neighbor reporting multiple gunshots at 19179 Appleton Street and dispatched officers to respond to that address. 911 Recording, ECF No. 29-2; 911 Transcript, ECF No. 29-3.

Multiple scout cars and officers responded to the scene. *See* DPD Reports, ECF No. 34-3. DPD officers were familiar with 19179 Appleton Street as a "problem house" as they had been called to that location for shots fired on multiple prior occasions. *See* ECF No. 29-4 at 23:26, 23:52–23:56; ECF No. 34-3, PageID.322. Upon arrival, officers observed several people fleeing on foot and driving away in vehicles, and heard someone yell "they shooting, they shooting." DPD Reports, ECF No. 34-3,

3

PageID.311.[1] Officers in another scout car (Officers Dunn, Dennard, and Cowan-Williams) stopped a black Kia nearby and identified the occupants as having come from 19179 Appleton Street. *Id.* PageID.318. And nearby on Riverview Street, DPD officers Williams and Grima stopped three young men who were on foot, one block west of Appleton. One of those men stated that three people were shot inside the house. ECF No. 34-4 at 00:36–00.50; ECF No. 42, PageID.367. Officer Williams relayed that information over the radio. ECF No. 42, PageID.367.

DPD officers arriving at the 19179 Appleton Street house saw bullet holes in the front window and numerous spent shell casings on the front porch and on the sidewalk and street in front of the home. ECF No. 34-3, PageID.317, 322, 325; ECF No. 29-4 at 4:40, 6:26, 15:20, 15:36, 23:26. Police officers knocked loudly on the door several times, and after receiving no response, they forced entry into the house. ECF No. 29-4 at 6:55–8:05. After entering the house, officers heard noises in the basement and ordered everyone to come upstairs with their hands up. *Id.* at 8:36–8:59. An officer's body-camera recorded twenty-seven teen-agers, both

---

[1] Hunt disputes this assertion in Officer Spencer's report, stating that Officer Spencer's reports of "seeing people run away and hearing them yell 'they shooting, they shooting'" were not captured on his or his partner's body-worn camera recordings, "suggesting they did not occur." ECF No. 41, PageID.355. Defendant does not, however, provide a copy of Officer Spencer's or Officer Epperson's body cam videos, so has not produced any evidence contradicting their Report at ECF No. 34-3, PageID.311. And, in any event, Defendant did not raise this point during oral argument so the Court gives it little weight.

male and female, emerging at the top of the basement stairs, one-by-one. *Id.* at 9:01–11:50. Officers then went down into the basement and found another person, "C.A.," hiding in a basement bedroom next to a gun. *Id.* at 12:30–14:04. Additional officers conducted a protective sweep to help clear the house. They observed firearms evidence in the home and determined they would need a search warrant. ECF No. 34-3, PageID.322; ECF No. 29-12; ECF No. 29-4 at 20:15–20:43, 23:00–23:20.

In the meantime, police officers detained the large group of young people on the front lawn of the house and began the process of identifying them. Many of the individuals were younger than 18 and were ultimately released to their guardians. ECF No. 34-3, PageID.328–29. Detective Derrick Mott typed up and submitted a warrant to search 19179 Appleton Street for evidence related to the shooting based on information relayed to him by Sgt. Danescu. ECF No. 29-12; ECF No. 24-8 at 7:50–10:32. A Wayne County Assistant Prosecuting Attorney approved the warrant for submission at around 11:18 p.m., and the 36th District Court Magistrate authorized and issued the warrant at 12:01 a.m. ECF No. 29-12, PageID.165, 168.

While waiting on the warrant, an officer had placed a lawn chair against the back screen door to prevent anyone from entering or exiting the house through that door. ECF No. 34-3, PageID.331. At approximately 12:00:39 a.m., officers heard a "loud noise" or a "loud bang" from the rear of the Appleton Street house and went to the

backyard to investigate. *Id.* PageID.328–29; ECF No. 29-13 at 00:00:39–00:0048. Officers observed that the chair had been knocked down and the inner back door was ajar. ECF No. 34-3, PageID.329, 331. The officers believed someone could have entered the house and so they reentered the house to secure it. *Id.* Upon entry and as they were clearing a back room, the officers located, but did not seize, a white spray-painted AR pistol in the closet. *Id.* at 331; ECF No. 29-13 at 1:00–06. The officers next cleared a bathroom before moving into the second bedroom on the main floor. There Sgt. Cook found Hunt, wearing a ski mask, hiding, and crouched down on the floor. ECF No. 29-13 at 1:15–1:42. The officers detained Hunt. ECF No. 34-3, PageID.332.

A short time later the officers searched the residence pursuant to the authorized search warrant and recovered the white spray-painted AR pistol. *Id.* Officers also located multiple handguns equipped with Machine Gun Conversion devices in the basement of the house, as well as a lower receiver with light attachment and extended magazine, numerous spent shell casings, and several rounds of live ammunition. *Id.*; ECF No. 1, PageID.7 The government asserts that the white spray-painted AR pistol turned out to be a privately manufactured firearm, with no serial number, also known as a "ghost gun." The gun was loaded

with a magazine containing 5.56 caliber ammunition. ECF No. 1, PageID.7.[2]

On September 5, 2024, a grand jury returned an indictment charging Hunt with one count of felon in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1), for the ammunition housed inside the white spray-painted AR pistol. ECF No. 11.

## II.    LEGAL STANDARD

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV; *see also Illinois v. Gates*, 462 U.S. 213, 238–40 (1983). A place to be searched need not be the defendant's home for the defendant to have a legitimate expectation of privacy in that place. *United States v. Whitehead,* 415 F.3d 583, 587 (6th Cir. 2005). This is because the Fourth Amendment protects people, not places. *Id.* The Sixth Circuit has recognized that, "[b]ecause Fourth Amendment rights

---

[2]    The Complaint explains that officers recognized Hunt as a member of the street gang Murdaville and that they had been monitoring Hunt's social media accounts as part of an ongoing investigation of Murdaville. Officers recognized the white spray-painted AR style pistol from videos and stories featuring Hunt posted on Hunt's Instagram account on or about August 21, 2024. ECF No. 1, PageID.5–6 (with photos).

are 'personal,' the central inquiry in any suppression hearing is whether the defendant challenging the admission of evidence has shown a legitimate expectation of privacy in the place searched or the thing seized." *United States v. Adams*, 583 F.3d 457, 463 (6th Cir. 2009) (quoting *United States v. King*, 227 F.3d 732, 743 (6th Cir. 2000)).

In moving for suppression of evidence, the defendant bears "the burdens of production and persuasion." *United States v. Chaar*, 137 F.3d 359, 363 (6th Cir. 1998). Specifically, the defendant must demonstrate that the Government violated his constitutional rights in conducting a search or seizure. *See United States v. Rodriguez–Suazo*, 346 F.3d 637, 643 (6th Cir. 2003). But ultimately, the Government bears the burden to show by a preponderance of the evidence that its search or seizure was reasonable. *See United States v. Winters*, 782 F.3d 289, 295 (6th Cir. 2015); *United States v. Vining*, 675 F. Supp. 3d 778, 785 (E.D. Mich. 2023).

## III.   DISCUSSION

Hunt moves to suppress the evidence found by the police officers in the 19179 Appleton Street house on August 24, 2024, including the ammunition seized that night and his cell phone. He argues that the two warrantless entries into the Appleton Street residence violated his rights under the Fourth Amendment because no exigent circumstances existed for such searches. Hunt asserts that he has standing to challenge the

8

searches because he was a frequent and overnight guest at the Appleton Street residence.

The government responds first that Hunt's argument to suppress his cell phone evidence is moot because it does not intend to use any of that evidence in its case-in-chief. However, the government does contest Hunt's motion to suppress the ammunition seized that night. While the government argues that the two warrantless searches of the 19179 Appleton Street residence were reasonable and fall within the exception to the general rule prohibiting warrantless searches, it first contends that Hunt does not have standing to challenge either search of that house because he was not permitted to be there, per court order, and thus he cannot establish that he had a reasonable expectation of privacy there.

### A. Fourth Amendment Standing[3]

Hunt asserts that he possesses Fourth Amendment standing to challenge the police officers' searches of the 19179 Appleton Street residence on August 24, 2024. The government argues that Hunt had no

---

[3]    The Court notes that standing in Fourth Amendment cases, such as this one, can be "a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search." *Byrd v. United States*, 584 U.S. 395, 410–11 (2018). But "[u]nlike the Article III doctrine that shares its name, Fourth Amendment 'standing' is not jurisdictional and 'need not be addressed before ... other aspects of the merits of a Fourth Amendment claim.'" *United States v. Calhoun*, 834 F. App'x 128, 131 (6th Cir. 2020) (quoting *Byrd*).

reasonable expectation of privacy in the Appleton Street residence because he was present there in violation of a court order.

It is well established that to invoke protection under the Fourth Amendment, the defendant must show that "he had a legitimate expectation of privacy in the area searched or items seized." *United States v. Mathis*, 738 F.3d 719, 729 (6th Cir. 2013). To establish such an expectation, the defendant must show (1) that he had a subjective expectation of privacy, and (2) that his expectation was objectively reasonable. *United States v. Pollard,* 215 F.3d 643, 647 (6th Cir. 2000). To determine whether a defendant *subjectively* had a legitimate expectation of privacy requires that this Court "ask whether the individual, by conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that he sought to preserve something as private." *King*, 227 F.3d at 743–44 (citing *Bond v. United States*, 529 U.S. 334, 338 (2000)). Next, an expectation of privacy is *objectively* reasonable only when it is one that "society is prepared to recognize as legitimate." *Id.*; *see Smith v. Maryland,* 442 U.S. 735, 740 (1979). The defendant bears the burden of establishing both elements by a preponderance of the evidence. *See Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980); *United States v. Shelton*, 384 F. Supp. 3d 916, 923–24 (M.D. Tenn. 2019) (citing *United States v. Ponder*, 240 F. App'x 17, 19 (6th Cir. 2007)), *aff'd*, No. 20-6348, 2022 WL 684395 (6th Cir. Mar. 8, 2022).

"Whether a legitimate expectation of privacy exists in a particular place or thing is determined on a 'case-by-case basis'" and is based on the totality of the circumstances. *Adams*, 583 F.3d at 463 (quoting *King*, 227 F.3d at 744); *Vining*, 675 F. Supp. 3d at 792. Factors the courts consider include the defendant's proprietary or possessory interest in the place to be searched as well as "whether the defendant has the right to exclude others from the place in question; whether he had taken normal precautions to maintain his privacy; whether he has exhibited a subjective expectation that the area would remain free from governmental intrusion; and whether he was legitimately on the premises." *King*, 227 F.3d at 744 (collecting cases); *see also Shelton*, 384 F. Supp. 3d at 923–24 ("Factors that courts have considered to determine whether a defendant has a reasonable expectation of privacy in the place searched include: whether the defendant lived or was an overnight guest in a dwelling, how often and for how long the defendant stayed in the dwelling, whether the defendant maintained personal belongings in the residence, whether the defendant provided any sort of remuneration for the privilege of staying there, whether the defendant could come and go freely, the defendant's relationship to the host, and whether the Defendant had the right to exclude others or evidence manifesting an intent to exercise this right.") (collecting cases).

Hunt argues that he had an expectation of privacy in the Appleton Street residence because he was a frequent and overnight visitor to that

11

house. Hunt's GPS tether records show that he visited that house over multiple days before his arrest, including staying there from 11:29 p.m. on August 16th to 4:21 am on August 17th, from 11:28 p.m. on August 21st to 4:54 am on August 22nd, and from 5:22 p.m. on August 22nd until 10:31 a.m. on August 23rd, in addition to other shorter stays. *See* ECF No. 29-17; ECF No. 43. The government does not dispute Hunt's presence at the Appleton Street house on these occasions. Hunt argues that the frequency and length of his visits to that house, including three overnight visits, supports his legitimate expectation of privacy there.

It is true that the United States Supreme Court has held that overnight status alone is sufficient to demonstrate that a defendant had a legitimate expectation of privacy in the home of another. *Minnesota v. Olson*, 495 U.S. 91, 96–99 (1990) (holding "that an overnight guest has a legitimate expectation of privacy in his host's home" that is not diminished because he does not have "complete dominion and control over the apartment."). However, Hunt was not an overnight guest of the Appleton Street house on August 24th, when he was found there. He in fact arrived there only about 30 minutes before the shots fired reports at around 9:20 p.m. Nor was he an overnight guest at that house the night before his arrest. Accordingly, this factor does not weigh strongly in favor of a legitimate expectation of privacy. *See Minnesota v. Carter*, 525 U.S. 83, 89 (1998) (holding that "an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with

12

the consent of the householder may not."). In *Carter*, the Supreme Court distinguished *Olson* and held that persons present on a property not as overnight guests, but essentially for a business transaction for a matter of hours failed to demonstrate a "degree of acceptance into the household" and therefore did not have an expectation of privacy in the property. *Id.* at 90–91 (finding that "the purely commercial nature of the transaction engaged … the relatively short period of time on the premises, and the lack of any previous connection between respondents and the householder … [lead to the conclusion] that respondents' situation is closer to that of one simply permitted on the premises" and therefore the visitors had no legitimate expectation of privacy in the premises). This case is somewhere in between *Olson* and *Carter*.

Viewing the totality of the circumstances, the Sixth Circuit has found that a defendant had a legitimate expectation of privacy in another's home based on several indications of "acceptance into the household," such as status as an overnight guest as often as once a week over a period of two years, his possession of a key to the apartment which afforded him unfettered access to the premises and the ability to exclude and admits others, and his familial relationship with the householder. *United States v. Heath*, 259 F.3d 522, 532–33 (6th Cir. 2001); *see also Pollard*, 215 F.3d at 647–48 (defendant had standing to challenge the search of another's home because he had been friends with the lessee for approximately seven years, occasionally spent the night there, kept some

personal belongings in a living room closet, ate meals with the family during visits, and was permitted to stay in the home even when the residents were not present). But casual visitors to a house do not have standing to challenge a search of the premises. *See, e.g., United States v. Berryhill*, 352 F.3d 315, 317 (6th Cir. 2003) (denying standing to defendant who did not possess any of the items that would be expected of an overnight guest, noting "[h]e carried no clothes or toothbrush; indeed, the only bag in his possession contained materials for manufacturing methamphetamines"); *United States v. Harris*, 255 F.3d 288, 294 (6th Cir. 2019) (defendant who was a casual, non-overnight visitor to the house searched had no legitimate expectation of privacy).

Under the totality of the circumstances in this case, other than his visits to the Appleton Street residence over a period of several days and three overnight stays prior to his arrest, Hunt offers no evidence of any other indicia of "acceptance into the household" similar to those found in other cases sufficient to confer standing under the Fourth Amendment. Hunt was not an overnight guest at the Appleton Street house when he was arrested, nor the night before that. He in fact arrived less than 30 minutes before the reports of shots fired at the house. And as the government pointed out at the hearing, while GPS tether records show Hunt at or near the property a number of times leading up to his arrest, it is not clear that he was inside the house at all of those times, as opposed to being outside the property or in a car in front of the house. While Hunt

asserts that he was friends with the owner of the house, he concedes that he did not possess a key to the house, he did not have the right to exclude or attempt to exclude others from the property, he did not maintain personal belongings in the residence, and he did not pay any sort of remuneration for staying there. These factors diminish Hunt's expectation of privacy in the Appleton Street residence at the time of his arrest.

Hunt must also establish that his expectation of privacy "is one that 'society is prepared to recognize as legitimate.'" *United States v. Washington*, 573 F.3d 279, 283 (6th Cir. 2009). The government argues that Hunt's expectation of privacy is not objectively reasonable because his overnight presence at the 19179 Appleton Street house was wrongful and in direct violation of a court order. Hunt had been ordered by the Wayne County Third Circuit Court to spend nights between the hours of 8:00 p.m. and 7:00 a.m. only at his godmother's house on Iris Street in Detroit. ECF No. 34-2, PageID.306–07. Accordingly, Hunt, who was in violation of the terms of his probation when he was found at the 19179 Appleton Street residence at approximately 12:00 a.m. on August 24th, was not legitimately on the premises at the time of the search.

The government argues that multiple courts have held that a defendant who was present at a location in violation of a court-issued protective order lacked a legitimate expectation of privacy at that location, and thus lacked standing to assert a Fourth Amendment

challenge to the search. ECF No. 34, PageID.288–89 (citing in part *Commonwealth v. Morrison*, 710 N.E.2d 584, 586 (Mass. Sup. Jud. Ct. 1999) (even though defendant was an overnight guest, he lacked standing because he was the subject of a protective order to stay away from that very location, and "[i]t is simply nonsense to say that society is prepared to recognize his right to be where society by the processes of law has ordered his not to be.") and collecting cases from multiple jurisdictions). "The courts that have considered the issue have held unanimously that a defendant does not have a legitimate expectation of privacy in a place from which a protective order excludes the defendant." *United States v. Murray*, 352 F. Supp. 3d 327, 332 (S.D.N.Y. 2019) (collecting cases); *see also United States v. Dye*, No. 10cr211, 2011 WL 1595255, at *5 (N.D. Ohio Apr. 27, 2011) ("It seems incredible that the defendant could maintain that he had a reasonable expectation of privacy in the home of a person with whom he had been ordered by the court to have no contact."), *aff'd*, 538 F. App'x 654 (6th Cir. 2013); *United States v. Schram*, 901 F.3d 1042, 1046 (9th Cir. 2018) ("[L]ike a defendant who may not challenge a search of stolen property, a defendant whose presence on a premises violates the law may not 'object to the legality of [the premises'] search.'") (citation omitted).

In *United States v. Gomes*, — F. Supp. 3d —, No. 24-cr-10082, 2025 WL 1372317 (D. Mass. May 12, 2025), the defendant, Edson Gomes, moved to suppress evidence obtained following a warrantless search of

16

an apartment in Brockton, Massachusetts in which he was a guest. Gomes argued that he had a subjective expectation of privacy in the apartment because he was an overnight guest there and possessed keys to the apartment. *Id.* at *2. Gomes had previously been convicted in federal court of conspiracy to possess with intent to distribute fentanyl and was on supervised release at the time of the search. As a condition of his supervised release, he was prohibited from entering the city of Brockton or knowingly associating with other felons. *Id.* at *1. The court denied Gomes' motion to suppress, stating:

> Here, Gomes was not permitted to enter Brockton under the terms of his court-ordered supervised release. By violating that court order, Gomes was on property that the law prevented him from entering. Accordingly, any subjective expectation of privacy he may have held is not one that society would recognize as reasonable. He therefore lacks standing to challenge the initial warrantless entry or the subsequent warrant-based search that flowed from it.

*Id.* at *3. The court explained that "[t]he principal that one cannot claim a legitimate expectation of privacy in a place he is not legally permitted to be extends logically to violations of court orders such as conditions of supervised release. *Id.*

In response, Hunt contends only that the Sixth Circuit has never decided standing issues solely on the lawfulness of a defendant's conduct or presence, and instead applies a fact-intensive inquiry into the "indicia of [a defendant's] acceptance into the household." ECF No. 41 (citing

17

*Heath*, 259 F.3d at 532–33). However, the Sixth Circuit has recognized that persons who are not legally on the property at issue "cannot have an objectively reasonable expectation of privacy in the property[.]" *See Washington*, 573 F.3d at 284 (citing *United States v. McRae*, 156 F.3d 708, 711 (6th Cir. 1998)); *see also Whitehead*, 415 F.3d at 587 ("[T]hose who inhabit a residence wrongfully may not claim a legitimate expectation of privacy in the property."); *United States v. Hunyady,* 409 F.3d 297, 302 (6th Cir. 2005) (holding defendant had no expectation of privacy where the landlord changed the locks and provided him formal notice to vacate. And thus he "was instead a trespasser under Michigan law at the time of the search in question"); *United States v. Ross,* 43 F. App'x 751, 757 (6th Cir. 2002) (although defendant had a subjective expectation of privacy in the apartment because his personal belongings were there, he had no legitimate expectation of privacy in that apartment after his lease expired and he was required by its terms to vacate the premises); *United States v. Allen,* 106 F.3d 695, 699 (6th Cir.1997) (holding defendant had no expectation of privacy in a hotel room after the motel manager locked him out of the room and took possession of the room).

The Court finds *United States v. Gomes*, though not controlling, instructive. In this case, Hunt was permitted, as a term of his court-ordered supervision, to stay *only* at his godmother's house on Iris Street in Detroit between the hours of 8:00 p.m. and 7:00 a.m. Thus, although

he was not prohibited from being at the Appleton Street property specifically per the terms of a court order (as in the PPO cases), the court's order essentially prohibited him from being anywhere else except the Iris Street address between the overnight hours. As the government explained at the hearing, instead of listing all of the places Hunt could not legally be, the state court's order instead listed the *only* place he was permitted to be. Therefore, as in *Gomes*, Hunt was not legally permitted by the terms of his court-ordered probation to be at the 19179 Appleton Street house at approximately midnight on August 24, 2024 when he was arrested, or even when he claims he was an overnight guest there two nights prior, on August 22nd. By being at the 19179 Appleton Street house in violation of that court order, Hunt was at a place the law prevented him to be. Hunt's expectation of privacy in the 19179 Appleton Street house therefore is not "one that society is prepared to recognize as objectively reasonable."

Therefore, considering the totality of the circumstances as discussed above, the Court finds that Hunt has not met his burden to demonstrate that he had a legitimate expectation of privacy in the Appleton Street residence at the time he was arrested. Despite visiting the 19179 Appleton Street address, and staying there overnight three times, Hunt was not an overnight guest on the property at the time of his arrest, or the night before that, he did not possess a key to the house, he did not have the right to exclude or attempt to exclude others from the

property, he did not maintain personal belongings in the residence, he did not pay any sort of remuneration for staying there, and he was not permitted to be there per the terms of the state court's order. *See Shelton*, 384 F. Supp. 3d at 923–24 (concluding that "too many unanswered questions remain for the Court to conclude that Defendant had a legitimate expectation of privacy" in the house at issue, including whether the defendant had any personal belongings or mail at the house, whether he was paying to stay at the house, whether he could come and go freely, and whether he had the right to exclude others). Accordingly, Hunt lacks standing to challenge the warrantless entries at the 19179 Appleton Street residence, and his motion to suppress evidence seized from that residence will be **DENIED**.

### B. Exigent Circumstances – Initial Search

Even if the Court found that Hunt has standing to challenge the two warrantless entries into the 19179 Appleton Street house, his motion to suppress would be denied.

In addition to lack of standing, the government argues that Hunt's motion to suppress must be denied on the merits because the police officers' initial search and protective sweep of the Appleton Street residence was justified by the exigency of the situation. A "protective sweep" is a "quick and limited search of the premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). It extends only to a cursory

20

inspection of places where an individual may hide and lasts "no longer than is necessary to dispel the reasonable suspicion of danger[.]" *Id.* at 335–36.

Hunt counters that the initial entry into the Appleton Street house was unconstitutional because the police officers had no objectively reasonable basis to believe that someone inside needed immediate aid or faced imminent danger, and thus no exigent circumstances existed justifying the warrantless search.

"The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (citations omitted). "Warrantless entries [into a residence] are permitted, however, where 'exigent circumstances' exist." *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002). The Supreme Court has articulated four situations that may give rise to exigent circumstances: (1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, and (4) a risk of danger to the police or others. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). The "risk of danger" or "safety exigency permits officers to make a warrantless entry into a residence 'when they reasonably believe that a person within is in need of immediate aid.'" *Causey v. City of Bay City*, 442 F.3d 524, 529 (6th Cir. 2006) (quoting *Mincey v. Arizona*, 437 U.S. 385, 392 (1978)); *see also Brigham City*, 547 U.S. at 403; *Georgia v. Randolph*, 547 U.S. 103,

118 (2006) ("[I]t would be silly to suggest that the police would commit a tort by entering … to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur."). "In reviewing whether exigent circumstances were present, [the court] consider[s] the 'totality of the circumstances and the inherent necessities of the situation at the time.'" *United States v. Huffman*, 461 F.3d 777, 783 (6th Cir. 2006) (citing *United States v. Rohrig*, 98 F.3d 1506, 1511 (6th Cir. 1996)).

The government argues that the "risk of danger" exigency existed in this case when the officers initially entered the 19179 Appleton Street residence based on the 911 call reporting at least "twenty" shots fired, coupled with the officers' awareness of this house as a "problem house" where gang members hung out and their numerous visits to the house in the past. *See* ECF No. 34-3, PageID.330. In addition, several different officers in the area of the Appleton Street house heard "multiple caliber gunshots" with at least one coming from an automatic weapon at that same time. *Id.* at PageID.317, 325. Persons running from the house yelled "they shooting, they shooting," and a person stopped by police officers walking near the Appleton Street residence reported that three people were shot inside the house. ECF No. 34-4 at 00:36–00:50; ECF No. 42, PageID.367.[4] This was relayed to the other officers. Upon arrival at the

---

[4]     Hunt does not dispute that a person stated to the police officers that three people had been shot inside the Appleton Street residence but argues in his Reply brief that the officers obtained this statement in

19179 Appleton Street house, DPD officers saw bullet holes in the front window and numerous spent shell casings on the front porch and sidewalk and street in front of the home. ECF No. 34-3, PageID.317, 325; ECF No. 29-4 at 4:40, 6:26, 15:20, 15:36, 23:26. Police officers then knocked loudly on the door several times but received no response. Only then did they force entry into the house. ECF No. 29-4 at 6:55–8:05.

---

violation of the Fourth Amendment. ECF No. 41, PageID.353–55. Hunt argues that the officers used unnecessary force when detaining the three men. Hunt argues that officers may not use a Fourth Amendment violation as the basis for establishing an exigency. *Id.* (citing *Kentucky v. King*, 563 U.S. 452, 469 (2011)). It is well-established that police officers are not free to create exigent circumstances to justify their warrantless searches. *United States v. Campbell,* 261 F.3d 628, 633 (6th Cir. 2001) (citing *United States v. Morgan,* 743 F.2d 1158, 1163 (6th Cir. 1984)). Indeed, in order "for a warrantless search to stand, law enforcement officers must be responding to an unanticipated exigency rather than simply creating the exigency for themselves." *United States v. Chambers,* 395 F.3d 563, 566 (6th Cir .2005), *overruled on other grounds by Kentucky v. King,* 563 U.S. 452 (2011). Importantly, however, establishing that police have created an exigent situation usually requires a showing of "deliberate conduct on the part of the police evincing an effort intentionally to evade the warrant requirement." *Ewolski,* 287 F.3d at 504.

There is no evidence here to suggest that the police made a deliberate effort to evade the warrant requirement when they stopped and detained the three men walking away (or fleeing) from the Appleton Street house. Rather, it appears that the officers were properly conducting an ongoing investigation in response to multiple shots fired at that house. In fact Hunt's counsel conceded at the hearing that the officers had a legitimate reason to stop and question the three men. Accordingly, the Court finds that the officers did not intentionally create an exigent situation, but rather the exigent situation naturally arose when they responded to shots fired reports.

The Sixth Circuit has found that the presence of shots fired at a crime scene weighs in favor of finding an exigent circumstance that would justify entry to render emergency aid. In *United States v. Huffman*, 461 F.3d 777 (6th Cir. 2006), police officers responded to a 911 call reporting gunshots at the residence where Huffman was ultimately found. Upon arrival they discovered multiple bullet holes in the front windows of the home as well as shards of glass on the front porch. *Id.* at 780. They officers also saw, through the window, bullet holes on the walls inside the house as well as furniture. *Id.* Based upon their experience, the officers believed the bullet holes were made by an automatic weapon. They then entered the home through a partially-open window after first knocking and announcing their presence "to be sure that there was no one injured on the inside." Once inside the officers found Huffman asleep in a chair with a fully loaded semiautomatic assault rifle with a laser scope on the table in front of him and he was arrested and charged with felon in possession of a firearm, possession of a firearm by an illegal drug user, and possession of ammunition by a felon. *Id.* The court held that, even though the gunshots were reportedly fired approximately eight hours before the officers arrived on the scene, taking all of these facts together suggested that the risk of danger was still imminent and the officers therefore were justified to enter the residence without a warrant. *Id.* at 785. The court further stated that the warrantless entry "may not be held

24

unconstitutional simply because the reasonable concerns of the officers were not substantiated after-the-fact." *Id.*

In *Causey v. Bay City*, 442 F.3d 524 (6th Cir. 2006), police officers responded to a confirmed 911 call that gunshots had been fired from plaintiffs' residence. *Id.* at 526. The officers first knocked on the door but received no response. *Id.* The officers then entered and searched the plaintiffs' backyard, without a warrant, where they found four bullet casings. *Id.* at 527. After the officers received no response to a knock on the back door, they forced entry into the residence to check for any injured persons inside. *Id.* The court held that the risk of danger exception validated the warrantless entry into the home when the officers relied on information that gunshots had been fired, no one entered or left the residence, and no one answered the door. *Id.* at 530 (finding the officers' actions "not unreasonable" even though the residents told the officers through the window that there was no emergency).[5]

---

[5]    Courts in other jurisdictions have similarly held that officers can reasonably search for victims upon reports of gunfire at a residence. *See United States v. Gambino-Zavala*, 539 F.3d 1221, 1226 (10th Cir. 2008) (officers had reasonable belief to search apartment for injured persons based on a number of credible reports of multiple gunshots from the apartment complex) (citing *United States v. Holloway,* 290 F.3d 1331 (11th Cir. 2002) (holding anonymous 911 call about ongoing gunshots and arguing at certain house justified warrantless search of residence); *Tamez v. City of San Marcos,* 118 F.3d 1085 (5th Cir. 1997) (holding entry lawful where officers responded to a "shots fired" call and could hear noise in the house, but could not determine whether anyone was inside

The Sixth Circuit has also stated that the lack of visual confirmation that an unidentified victim had been shot does not defeat the reasonable belief that an injured individual may have been inside the residence. The Sixth Circuit in *Schreiber v. Moe*, 596 F.3d 323 (6th Cir. 2010) noted,

> It is true that this case lacks some of the more outward manifestations of violence that often support a finding of exigency. In particular, there were no signs of blood, [or] broken objects ... But these are not prerequisites to a finding of exigency. As the Supreme Court has noted, officers do not need ironclad proof of a likely serious, life-threatening injury

the house); *United States v. Donlon,* 909 F.2d 650 (1st Cir. 1990) (holding exigent circumstances exception applied where police entered home where there was a report of gunshots and children upstairs), *overruled on other grounds by United States v. Omar,* 104 F.3d 519, 522–23 (1st Cir. 1997))); *see also United States v. Walton*, 323 F. App'x 837, 840 (11th Cir. 2009) (denying motion to suppress where officers received emergency call reporting multiple rounds of gunshots in apartment complex across the street from an elementary school, officers discovered on scene multiple impact holes from an AK-47 and empty casings on the ground, an individual involved in the shooting identified the defendant as the perpetrator who kept weapons in his apartment, and officers were faced with an apartment potentially full of an unknown number of armed individuals); *United States v. Holstick*, Case No. 3:17-cr-223-WKW, 2018 WL 2676704, at *4 (M.D. Ala. Apr. 17, 2018) (finding it "was objectively reasonable for the officers to enter the trailer to search for potential victims" where they responded to a 911 call reporting a drive-by shooting, witnesses pointed to the trailer as the scene of the shooting, and officers could see bullet holes in the side of the trailer), *adopted in part by* 2018 WL 2560331, at *8 (M.D. Ala. June 4, 2018), *aff'd*, 810 F. App'x 732 (11th Cir. 2020) (per curiam).

> to invoke the emergency aid exception. As in *Fisher*, here it suffered to invoke the emergency aid exception that it was reasonable to believe that [the aggressor] was about to hurt, or had already hurt, [the victim].

*Id.* at 331 (internal citations and quotations omitted). Similarly, a warrantless entry "may not be held unconstitutional simply because the reasonable concerns of the officers were not substantiated after-the-fact." *Huffman*, 461 F.3d at 785.

Based on the totality of the facts known to the officers at the time of their initial entry into 19179 Appleton Street, exigent circumstances justified the warrantless entry and protective sweep of the house. A 911 call reported at least "twenty" shots fired at the house and nearby officers separately reported hearing gunfire that they recognized to be from an automatic weapon. A person fleeing the house reported to officers that three people had been shot. Upon arrival at the house the officers observed multiple bullet holes in the front windows and spent shell casings on the front porch and sidewalk in front of the home. The house was a known "problem house" where gang members hung out, and no one answered the officers' repeated knocks on the door. Based on these facts, the Court finds that the officers had a reasonable belief that persons within the Appleton Street house needed immediate aid, permitting the warrantless entry into the house. Hunt makes much of the fact that no one inside the house was injured. However, that the officers did not find

anyone in the house who was injured does not make this action unlawful. *See Huffman*, 461 F.3d at 785.

Accordingly, Hunt's motion to suppress the first warrantless entry into the 19179 Appleton Street residence is **DENIED**.

### C. Exigent Circumstances – Second Entry

The government argues that the officers' second entry into the Appleton Street residence, which led to Hunt's arrest and seizure, was justified by the exigency of the situation, including the need to protect the officers at the scene and to prevent the destruction of evidence inside the house. Hunt argues that the second warrantless entry was unreasonable because any exigency was created by Sgt. Danescu's "mouse trap" tactic of leaning a chair on the house's back door. Hunt further argues that the mere moving of a chair is not an emergency, but at most suggested a possible criminal trespass, which is insufficient to justify a warrantless entry into a home. *See Washington*, 573 F.3d at 287 ("There is simply no legal support for holding that an ongoing criminal trespass, on its own, constitutes an exigency that overrides the warrant requirement.").

In addition to the "risk of danger" exigency, the government asserts the second entry into the Appleton Street residence was also justified by the "destruction of evidence" exigency. The Sixth Circuit "has long recognized … that exigent circumstances will be present when there is an urgent need to prevent evidence from being lost or destroyed." *United*

28

*States v. Sangineto-Miranda*, 859 F.2d 1501, 1511 (6th Cir. 1988) (collecting cases); *see also Missouri v. McNeely*, 569 U.S. 141, 149 (2013). "When police officers seek to rely on this exception in justifying a warrantless entry, they must show an objectively reasonable basis for concluding that the loss or destruction of evidence is imminent." *Sangineto-Miranda*, 859 F.2d at 1512. "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *United States v. Evans*, 549 F. App'x 397, 402 (6th Cir. 2013) (alteration in original) (quoting *Brigham City*, 547 U.S. at 403 (quoting other sources)). Thus, a warrantless entry into a defendant's house "does not trigger the exclusion of evidence if the officers had an 'objectively reasonable belief,' that the circumstances justified immediate entry." *Id.* (quoting *Johnson v. City of Memphis*, 617 F.3d 864, 868 (6th Cir. 2010)). The courts analyze whether such a belief was objectively reasonable under a totality of the circumstances standard. *See McNeely*, 569 U.S. at 145.

In the Sixth Circuit, "[w]here an officer believes that he must enter a private residence without a warrant to prevent the immediate destruction of contraband, he must demonstrate: '1) a reasonable belief that third parties are inside the dwelling; and 2) a reasonable belief that these third parties may soon become aware the police are on their trail, so that the destruction of evidence would be in order.'" *United States v. Ray*, 577 F. App'x 526, 531 (6th Cir. 2014) (citing *Sangineto–Miranda,* 859 F.2d at 1512).

29

The government states that after the officers' first entry into and protective sweep of the 19179 Appleton Street house, they found 27 people hiding in the basement. After officers ordered everyone in the basement to come upstairs, the officers walked downstairs to continue their sweep and found another man hiding in the basement next to a firearm equipped with a brass catcher (an accessory device to retain spent shell casings). Because the officers believed additional, unsecured firearms were in the house, they applied for a search warrant to seize those items. While waiting for the warrant to issue, officers heard a loud noise at the back of the house, alerting them that someone may be inside. The officers found the back door ajar and a chair that had been propped against the door was toppled. Suspecting that someone was inside the house with the unsecured firearms posed a danger to the officers and others around the house. In addition, the officers had a reasonable fear that a person in the house could tamper with the firearm evidence inside the house. The officers therefore had a reasonable belief that third parties were inside the house, that third parties were aware that police were at the house, that there was firearms and firearms-related evidence in the house, and that the destruction of such evidence in the house was possible. Therefore, looking at the totality of the evidence, the Court finds that exigent circumstances existed justifying the second entry into the Appleton Street house, immediately preceding the issuance of the search warrant at 12:01 a.m.

Hunt's motion to suppress the second warrantless entry into the 19179 Appleton Street residence is **DENIED**

### D. Inevitable Discovery of the Spray-Painted AR Pistol

The government argues that even if the second entry into the Appleton Street house was deemed illegal, the loaded white spray-painted AR pistol located during that protective sweep would have been inevitably discovered when the signed search warrant arrived less than one minute later. Hunt does not dispute this, and instead argues in his Reply brief that the search warrant was not a lawful warrant because it did not specify any specific items to be seized, and thus it was facially deficient.

Addressing Hunt's argument first, the search warrant authorized a search of the 19179 Appleton Street residence "to recover the firearm(s) used in the shooting, along with any other firearms, ammunition, and evidence limited to the discharge of weapons" at the house. ECF No. 29-12. Thus, the search warrant did sufficiently specify the recovery of the white spray-painted AR pistol, ammunition, and other firearms that were recovered as a result of execution of the warrant. To the extent Hunt argues that the search warrant did not provide for a seizure and search of Hunt's cell phone, the government has stated that it does not intend to use any of Hunt's cell phone evidence in its case-in-chief, and thus that argument is moot.

Turning to the government's argument, the inevitable-discovery doctrine provides that, where "the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." *Murray v. United States*, 487 U.S. 533, 539 (1988); *see also United States v. Crew*, No. 1:14cr107-1, 2015 WL 5095729, at *8 (S.D. Ohio Aug. 31, 2015) ("Any evidence obtained from the protective sweep also is subject to the independent source or inevitable discovery doctrine, as the search warrant was issued within a short time after the protective sweep."). For the doctrine to apply, the government must demonstrate "the existence of an independent untainted investigation that inevitably would have uncovered the same evidence," or "other compelling facts establishing that the disputed evidence inevitably would have been discovered." *United States v. Kennedy*, 61 F.3d 494, 499–500 (1995).

"The Supreme Court and [the Sixth Circuit] have applied the doctrine in several cases where, like this one, a potentially illegal search was followed by a search conducted in accordance with a valid search warrant premised on evidence of probable cause developed independently of the initial search." *See United States v. Bowden*, 240 F. App'x 56, 61 (6th Cir. 2007) (citing, *e.g., Murray,* 487 U.S. at 541–43 (remanding case for consideration of the inevitable-discovery doctrine where police conducted an initial, illegal search and later conducted a second, legal search in which they seized marijuana); *Segura v. United States,* 468 U.S.

796, 813–16 (1984) (holding that contraband would have been inevitably discovered where agents conducted a warrantless search while obtaining a search warrant and later conducted a second, legal search in which agents discovered contraband); *United States v. Keszthelyi,* 308 F.3d 557, 574 (6th Cir.2002) ("Thus, *Murray* teaches that the inevitable discovery exception ... applies when, as in the instant case, evidence discovered during an illegal search would have been discovered during a later legal search and the second search inevitably would have occurred in the absence of the first.")).

In this case, the officers found the loaded, white spray-painted AR pistol during the second entry into the Appleton Street house at approximately 12:01:18 a.m. The search warrant for the house was time-stamped almost contemporaneously, at 12:01 a.m., and was based on information independent of the second reentry into the house. Under these facts the Court finds that the inevitable discovery doctrine applies and that the AR pistol would have inevitably been found in the subsequent legal search, which also recovered spent casings, boxes of ammunition, and seven firearms, including the white spray-painted AR pistol.

Hunt's motion to suppress based on the sufficiency of the search warrant therefore is **DENIED**.

## IV.   CONCLUSION

For the reasons set forth above, Hunt's Motion to Suppress, ECF

No. 29, is **DENIED.**

**IT IS SO ORDERED.**

Dated: July 10, 2025          /s/Terrence G. Berg
                             HON. TERRENCE G. BERG
                             UNITED STATES DISTRICT JUDGE